# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 11-193 |
| | ) | |
| EBON P. D. BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

CONTI, District Judge.

Pending before the court is a motion to suppress evidence (ECF No. 28) filed by defendant Ebon P. D. Brown ("defendant") in the above-captioned case. On August 24, 2011, a federal grand jury in the Western District of Pennsylvania returned a one-count indictment (ECF No. 1) charging defendant with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). On September 23, 2011, defendant pleaded not guilty to the charge at count one of the indictment. (ECF No. 13.)

Defendant filed the present motion on March 12, 2012, seeking to suppress the admission of the firearm defendant possessed as alleged in count one of the indictment at Criminal No. 11-193. The government filed its response on March 20, 2012. (ECF No. 31.) Defendant filed a reply in support of the motion to suppress on April 20, 2012. (ECF No. 43.) On May 24, 2012, the court held a hearing on defendant's motion, at which time the court received evidence and heard testimony from Pittsburgh Police Department Detectives Thomas Gault ("Detective Gault"); Judd Emery ("Detective Emery"); Calvin Kennedy ("Detective Kennedy"); and Mark Adametz ("Detective Adametz"). (ECF No. 57.) The detectives were sequestered during the

hearing and were unable to observe or hear the testimony of the other witnesses. The hearing was continued until July 30, 2012, on which date the court heard testimony from defense witness James Cole ("Cole"). (ECF No. 71.) Following the July 30, 2012 hearing, the court took the parties' arguments under advisement and ordered the parties to file proposed findings of fact and conclusions of law with respect to defendant's motion to suppress. Defendant filed proposed findings of fact and conclusions of law on September 28, 2012 (ECF No. 67) and the government filed the same on October 26, 2012 (ECF No. 70.)

Upon consideration of the parties' submissions, and the evidence and testimony presented at the suppression hearing, the court makes the following findings of fact and conclusions of law:

I. **Findings of Fact**

A. **Background Information**

1. This case involves events that took place shortly after midnight on the morning of March 23, 2011 at the intersection of Wylie Avenue and Duff Street in the Hill District section of the City of Pittsburgh, Pennsylvania. (Hr'g Tr. May 24, 2012 ("May Tr.") (ECF No. 57) at 15-17.) The Hill District is part of Pittsburgh Police Department Zone 2, and is considered a high-crime area. (Id. at 29-30.)

2. The intersection of Wylie Avenue and Duff Street is in close proximity to the Flamingo Bar, which has been designated as a "nuisance bar" by the Pittsburgh Police. (Id. at 21.) The Flamingo Bar has been the scene of many violent incidents and arrests, including fatal and non-fatal shootings. (Id.) When entering the Flamingo Bar, patrons are searched for weapons with a hand-held metal detector "wand." (Id.)

3. Detectives Gault, Emery, Kennedy, and Adametz were on patrol on the night of March 23, 2011 in an unmarked police vehicle as part of the impact division of the Pittsburgh

2

Police narcotics unit. (Id. at 15-16.) Detectives in the impact division patrol in plain clothes, in groups of three or four, and focus on maintaining a presence in high-crime neighborhoods. (Id.) Detective Kennedy drove the unmarked police vehicle (Id. at 96); Detective Emery sat in the front passenger seat (Id. at 73); Detective Gault sat in the rear passenger-side seat (Id. at 18); and Detective Adametz sat in the rear driver's-side seat. (Id. at 115.)

4. On the morning of March 23, 2011, defendant was driving a 2002 maroon Chevrolet Impala with Pennsylvania registration number HRS-7627 (the "Impala"). (Id. at 18.) Defendant had driven the Impala on several prior occasions with permission of the car's owner, his acquaintance "Casandra." (Hr'g Tr. July 30, 2012 ("July Tr.") (ECF No. 71) at 27-29.) With defendant were Cole in the passenger seat and Anthony Pryor and Tyrique Jackson in the back seat. (Id. at 29-30.)

5. The detectives were traveling away from downtown Pittsburgh on Wylie Avenue when they observed the Impala in the opposite lane of Wylie Avenue traveling toward downtown Pittsburgh. (May Tr. at 20, 82-83, 97, 116.)

6. All four detectives observed the Impala as it parked near the intersection of Wylie Avenue and Duff Street. Detective Gault observed that the Impala was parked "right on the corner." (Id. at 17.) Detective Emery observed that the Impala was parked "right at the intersection . . . within two or three feet of the intersection." (Id. at 74.) Detective Kennedy observed that the Impala was "parked within two, three feet of [Duff] street." (Id. at 98.) Detective Adametz observed that the Impala was parked "right at the intersection." (Id. at 117.) Cole testified that the hinges of the front passenger-side door of the Impala were behind the light pole located near the corner of Wylie Avenue and Duff Street, but was unable to recall exactly how far the car was from the intersection itself. (July Tr. at 11-12, 32-33.)

3

7. All the detectives believed that the Impala was illegally parked. (Id. at 22, 85, 98, 117.)

8. Detectives Gault and Adametz testified that the Impala was parked near a stop sign at the intersection of Wylie Avenue and Duff Street. (Id. at 17, 117.) Evidence presented at the suppression hearing indicated, however, that there was no stop sign at that intersection on February 15, 2012, although the light pole immediately next to the Impala had a bus stop sign on it, and a fire hydrant was visible adjacent to the pole on Duff Street. (Id. at 43-45; Def. Ex. L, M, and N.)

9. After defendant parked the Impala, the occupants began to exit the vehicle as the detectives drove up next to the Impala, driver's door to driver's door, approximately six to ten feet away. (May Tr. at 74-75, 100.)

### B. Defendant's Movements in the Car

10. From their vantage point next to the Impala, each of the detectives observed defendant (who had been driving the car) exit the Impala, see the detectives' car, and sit back down in the driver's seat with the door open. (Id. at 24, 75, 102-03, 121.) The detectives all independently testified that defendant saw their vehicle—the usual vehicle driven by the impact division—just before he sat back down in the Impala. (Id.) Detectives Gault, Emery, and Adametz all testified that their vehicle was widely recognizable in the Hill District as being a Pittsburgh Police vehicle. (Id. at 35, 78, 116-17.)

11. Detective Gault testified that defendant looked right at the detectives' car and then appeared to lean back, as though pulling something out from his waistband area, then lean forward, as though putting something under the driver's seat. (Id. at 24.) Based upon sixteen years of experience, more than five hundred firearm arrests, and federal government-sponsored

4

training aimed at identifying the behavior of armed individuals, Detective Gault believed that defendant removed a firearm from his waistband and placed it under the seat. (Id. at 24-29.) Detective Gault testified that the behavior was consistent with a person carrying an illegal firearm. (Id. at 29.)

12. Detective Emery observed defendant from the chest area up, "hunched over a little bit and reaching with his right hand in his waistband area . . . pulling—making like a shoving, pulling motion. Then he bent down and shoved his hands towards the floorboard under the front edge of the driver's seat." (Id. at 75.) Based upon more than eleven years' experience as a police officer, Detective Emery believed that defendant was "concealing a firearm and shoving it or stowing it underneath his seat." (Id. at 72, 76.)

13. Detective Kennedy, who was driving the police vehicle and was closest to defendant, observed defendant look in the direction of the detectives' car, reach into his waistband, and pull out an object that Detective Kennedy believed to be a pistol. (Id. at 103, 112.) At the time, Detective Kennedy was unable to specifically identify the object, but he observed defendant quickly place the object on the floor under the driver's seat. (Id. at 103-04.) Detective Kennedy was concerned that when one firearm is discovered, other firearms are often present. (Id. at 109.)

14. Detective Adametz observed that all the Impala's occupants saw and appeared to recognize the detectives' car. (Id. at 116, 121.) He saw defendant's upper body and shoulders, and that defendant appeared to pull something out of his waistband and leaned forward as though he put something under his seat. (Id. at 121.) Based upon his training and experience, Detective Adametz believed defendant pulled a firearm from his waist area and put it under his seat. (Id. at

5

129.) Detective Adametz was concerned at the time that "where there's one gun, there's two guns." (Id. at 127.)

15. The detectives observed the Impala's occupants exit the car at roughly the same time, except for defendant, who sat back down and made the movements described above (with the door still open) before exiting the car and closing the driver's side door. (Id. at 23-24, 78, 86, 94, 101-03, 121.)

16. The detectives' car stopped parallel to the Impala after all four of its occupants had exited the car and were walking toward the Flamingo Bar. (Id. at 78.)

### C. The Encounter

17. The detectives exited their car and approached defendant and the other three individuals who had been riding with him in the Impala. (Id. at 32-33.) None of the detectives told defendant or the other individuals to stop, (id. at 33), or removed their firearms from their holsters. (Id. at 33-34, 87, 106, 112, 126, 129.)[1] The detectives' badges were visible. (Id. at 49, 105, 126.) The lights or sirens on their police vehicle were not engaged. (Id. at 77.) Detective Adametz identified the detectives as Pittsburgh Police officers. (Id. at 87, 126.)

18. The detectives called for backup during the encounter because, as stated by Detective Gault, the detectives were evenly matched by the number of occupants of the Impala. (Id. at 52.)

19. Detective Gault approached defendant first. (Id. at 32-33.)

20. As Detective Gault was in the process of speaking with defendant about where the Impala was parked and asking for identification, (Id. at 33), Detective Emery walked around the passenger side exterior of the Impala and shined his flashlight through the windshield into the

---

[1] Cole, who was aware that the detectives were police officers, testified that at least some of the detectives removed their firearms from their holsters. (July Tr. at 13-14.) The court, however, credits the testimony of the detectives that their firearms were not drawn.

6

car. (Id. at 79.) The light revealed "the grip and rear slide portion of a semi-automatic firearm sticking out from underneath the driver's seat." (Id.) Detective Emery indicated to Detective Gault that he saw a firearm by extending his pointer finger and his thumb, mimicking the shape of a gun. (Id. at 80.)

21. Seeing Detective Emery's gesture, Detective Gault grabbed hold of defendant's waistband or belt loop area, to prevent defendant from running away. (Id. at 80, 87.)

22. Detective Emery asked "if [defendant] had a permit to carry a firearm, and he stated he did not." (Id. at 80, 88.)

23. Detective Gault placed defendant under arrest and began handcuffing him. (Id. at 34, 80.)

24. As Detective Gault handcuffed defendant, Detective Emery opened the driver's door of the Impala (which he testified was closed but unlocked) and retrieved a silver nine-millimeter handgun, serial number 023121. (Id. at 34, 51, 80-81, 90); (ECF No. 32 at 3).

25. Defendant was searched incident to arrest. (May Tr. at 52, 92, 127.)

26. Detective Emery made the firearm safe and stowed it in the trunk of the detectives' car because the other individuals were still on the scene and, according to his testimony, the detectives "were pretty much outnumbered." (May Tr. at 90-91.)

27. The detectives and Cole acknowledged that defendant was the only individual handcuffed and arrested during the incident. (Id. at 88, 106, 108, 125) (July Tr. at 22.)

28. Detective Adametz conducted a pat-down of Tyrique Jackson, one of the other individuals who was with defendant. (May Tr. at 126-27.) Cole testified that he was also patted down. (July Tr. at 18-19.)

29. During the incident, the names of defendant and the other individuals who were with him were checked through the National Crime Information Center, a national criminal database. (May Tr. at 51.)

30. Following defendant's arrest, Cole was given the Impala's keys and asked to move the car to a different parking space, which he did. (Id. at 35, 53, 92-93, 111, 113, 128); (July Tr. at 21-22.) Detective Gault testified that he would not allow anyone to move the car if it contained a firearm. (May Tr. at 35.)

31. After Cole moved the car, he and the other two individuals who had been with defendant proceeded to the Flamingo Bar. (July Tr. at 22.)

32. The encounter from the time the detectives began talking with defendant until he was arrested lasted approximately one minute. (ECF No. 32 at 2.)

**II. Conclusions of Law**

1. When police conduct a search or seizure without a warrant, the government bears the burden of showing that the search or seizure was reasonable under the Fourth Amendment. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).

2. The Fourth Amendment to the United States Constitution provides that: "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . ." U.S. CONST. amend. IV.

3. The Fourth Amendment generally requires police to secure a warrant supported by probable cause before conducting a search, unless a recognized exception to the warrant requirement exists. Maryland v. Dyson, 527 U.S. 465, 466 (1999) (citing California v. Carney, 471 U.S. 386, 390-91 (1985)).

4. The test for determining whether a search has occurred was set forth in Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). Katz "posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" California v. Ciraolo, 476 U.S. 207, 211 (1986).[2]

**A. Mere Encounter**

5. The government argues that the events prior to Detective Gault grabbing defendant's waistband amounted to nothing more than a mere encounter with defendant, and did not implicate the Fourth Amendment. (ECF No. 70 at 9.) Not every encounter between a citizen and police constitutes a seizure within the scope of the Fourth Amendment. United States v. Williams, 413 F.3d 347, 352 (3d Cir. 2005). A seizure only occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry, 392 U.S. at 19 n.16. Officers do not violate the Fourth Amendment "'merely by approaching individuals on the street or in other public places." Williams, 413 F.3d at 352 (quoting United States v. Drayton, 536 U.S. 194, 200 (2002)). Courts recognize that "consensual encounters are important tools of law enforcement and need not be based on any suspicion of wrongdoing." Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003). Courts have held that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). Officers may approach a person and ask them questions, even if they "'have no basis for suspecting a particular individual.'" United States v. Smith, 575 F.3d 308, 312 (3d Cir. 2009) (quoting Drayton, 536 U.S. at 200-01).

---

[2] The parties agree that defendant had a reasonable expectation of privacy in the contents of the Impala because he was using it with the permission of the owner. United States v. Baker, 221 F.3d 438, 441-43 (3d Cir. 2000); (July Tr. at 29). The parties also agree that defendant has standing to challenge the detectives' search. (July Tr. at 29.)

6. An encounter becomes a seizure when, under all the circumstances surrounding the encounter, police conduct signals to a reasonable person that "he [is] not at liberty to ignore the police presence and go about his business." Kaupp v. Texas, 538 U.S. 626, 629 (2003). Some factors to consider are "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Mendenhall, 446 U.S. 544, 554 (1980). The test for whether a citizen has been seized is "an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." California v. Hodari D., 499 U.S. 621, 628 (1991).

7. In the present case, the detectives approached the individuals who had exited the Impala after defendant parked it, and as they were walking away.[3] Nothing about the initial encounter evidenced a use of force or show of authority that would give rise to a Terry stop. Terry, 392 U.S. at 19 n.16. Detective Gault had just begun talking to defendant when Detective Emery signaled to him about the presence of the gun. Such a brief encounter, even if Detective Gault did request defendant's identification, does not rise to the level of a Terry stop, particularly where no evidence indicated that Detective Gault demanded a response, or otherwise indicated that compliance was required. Mendenhall, 446 U.S. 555 (finding no seizure where agents approached defendant in a public space, identified themselves as federal agents, asked to see

---

[3] The parties spend a significant amount of time addressing the alleged parking violation. The court need not, however, address whether the violation was sufficient to justify a Terry stop, since there was no traffic stop in this case. The detectives perceived a public safety risk associated with where the Impala was parked, and approached the occupants to discuss those concerns. Officers are permitted to approach citizens for the purpose of asking questions. See Bostick, 501 U.S. at 434.

defendant's identification and ticket, and posed a few questions); accord Bostick, 501 U.S. at 435.

8.  The detectives approached the scene without activating their lights or sirens, and without drawing their weapons or ordering the defendant to stop. No evidence indicated that the detectives raised their voices, and there was no "threatening presence," since the number of detectives evenly matched the number of individuals who had exited the Impala. Id. at 554. The detectives' approach and initial contact with defendant was therefore a mere encounter during which they were allowed to approach him and speak with him without implicating the Fourth Amendment. Bostick, 501 U.S. at 434.

### B. Justification for the Terry Stop

9.  Defendant argues that the initial stop was not justified because the Impala was not illegally parked. (ECF No. 67 at 9-17.) As discussed above, the detectives did not stop the Impala; rather, they approached the occupants who had recently exited the vehicle to discuss the concerns they had about where the vehicle was parked. As such, the government argues, and the court agrees, that the encounter did not ripen into a Terry stop until Detective Gault grabbed defendant's waistband after the gun was observed. Mendenhall, 446 U.S. at 554. The totality of the circumstances leading up to that point, however, justified the brief physical contact that occurred immediately prior to defendant's arrest.

10. A well-established exception to the Fourth Amendment's warrant requirement permits an officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than the preponderance of

the evidence . . . [of] at least a minimal level of objective justification for making the stop." Id. (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). The Fourth Amendment requires the court to look at the totality of the circumstances surrounding an incident in determining whether officers had a reasonable suspicion. Terry, 392 U.S. at 9.

11. A mere encounter can ripen into an investigatory detention, i.e. a Terry stop, if, as the circumstances unfold, officers observe facts which give rise to a "reasonable, articulable suspicion" of criminal activity. United States v. Black, 525 F.3d 359, 362 (4th Cir. 2008). In Black, officers initially questioned the defendant on the street after observing his hand awkwardly shoved in his pocket, at night, in a high-crime area. Id. at 361-62. As officers questioned the defendant, one officer used his flashlight to illuminate the pocket, revealing an outline that appeared to be part of a firearm. Id. at 362. The officers then "seized" the defendant within the meaning of Terry by threatening to shoot him if he did not remove his hand from the pocket. Id. Following a pat down that revealed the firearm, the defendant was arrested when he confirmed that he did not have a permit for the firearm. Id. The Court of Appeals for the Fourth Circuit ultimately concluded that the officers had a reasonable suspicion to effectuate a Terry stop once they observed the outline of the firearm. Id. at 365-66.

12. Officers may use a show of force when effectuating a Terry stop if the stop is reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995) (citing Hensley, 469 U.S. at 235).

13. In the present case, the facts establishing reasonable suspicion began to develop when defendant made furtive movements after he observed and appeared to recognize the detectives as police officers. All four detectives confirmed, based on their extensive law

enforcement experience and training, that defendant's movements were consistent with removing a firearm from his waistband and hiding it under his seat in the Impala. United States v. Moorefield, 111 F.3d 10, 14 (3d Cir. 1997) (finding reasonable suspicion where, inter alia, defendant's behavior was consistent with a person trying to conceal something; i.e., he "leaned back and appeared to shove something down toward his waist"). Detective Gault confirmed that defendant's behavior was consistent with a person trying to conceal an illegally possessed firearm.

14. The area near the Flamingo Bar in Pittsburgh Police Department Zone 2 is a high crime area, particularly late at night, where several violent incidents, including fatal and non-fatal shootings, have occurred in the past. The nature of the area is a fact that may be considered in determining whether the Terry stop was justified. United States v. Valentine, 232 F.3d 350, 356 (3d Cir. 2000) (noting that "'the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a Terry analysis'" (quoting Wardlow, 528 U.S. at 124)).

15. By the time Detective Gault used a minimal amount of force to restrain defendant by grabbing his waistband, he was aware of the final justification for escalating the encounter into a Terry stop—the presence of the firearm under defendant's seat. Black, 525 F.3d at 362 (allowing a Terry stop where officers observed the outline of a firearm under circumstances similar to the present case).[4]

16. In effectuating the investigatory detention, Detective Gault used only a minimal amount of force—certainly no more than was absolutely necessary to maintain the status quo and allow the officers to confirm that defendant did not have a permit to carry the firearm. Edwards, 53 F.3d 619.

---

[4] As will be discussed in subsection E, infra, the firearm was legally observed from outside the automobile.

17. The seizure was also incredibly brief, and was no longer than necessary for Detective Emery to confirm that defendant did not have a permit to carry the firearm. Mosley, 454 F.3d at 255 n.9; Black, 525 F.3d at 362.

18. Based on the totality of the circumstances, the detectives had reasonable suspicion of illegal activity. As the detectives approached the Impala in their car, defendant made furtive movements consistent with concealing an illegal firearm under the seat. He made those movements in response to the detectives' presence. The Impala's location late at night in an area known for violent gun crimes also contributed to the detectives' reasonable suspicion that criminal activity was afoot. Finally, Detective Emery's observation of the firearm itself confirmed that a firearm was present, and thus justified a brief detention during which it was confirmed that the firearm was illegal. Based upon all of the foregoing, a Terry stop was warranted. Wardlow, 528 U.S. at 123.

### C. Custodial Arrest

19. Defendant, however, argues that the encounter was not a Terry stop, but was in fact a custodial arrest for which there was no probable cause. (ECF No. 67 at 19-24.) Defendant largely bases his argument upon allegations that the detectives approached the defendant and the individuals who were with him with "guns drawn." (Id. at 19.)

20. The line between a Terry stop and a custodial arrest is not a bright one. United States v. Askew, 403 F.3d 496, 507 (7th Cir. 2005).

21. A "vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se. Id. The mere fact that a defendant is not "'free to leave'" does not indicate that a Terry stop has escalated into a custodial arrest. Id. Courts also inquire into the length of any encounter in

determining whether an arrest occurred. Id. at 620. Therefore, even if the detectives had drawn their firearms, that fact might not have been sufficient for the stop to constitute an arrest.

22. The encounter between the detectives and defendant prior to the recovery of the firearm was not an arrest. The credible testimony of all four detectives (who were sequestered during the hearing) indicated that none of them removed their firearms from the holster during the entire encounter. Defendant's argument that the encounter constituted an arrest is inconsistent with this credible testimony. The encounter took less than a minute. (ECF No. 32 at 2.) Given the brief duration of the encounter and that none of the detectives drew their firearms, the events are properly considered a mere encounter that ripened into a Terry stop, as discussed above.

### D. Scope of the Terry Stop

23. Defendant argues that the recovery of the firearm from under the driver's seat of the Impala exceeded the permissible scope of a Terry search. (ECF No. 67 at 17-18.) The search of a suspect during a Terry stop is limited to patting down the suspect's outer clothing to discover whether he is in possession of weapons that may pose a danger to the officer and others nearby. United States v. Yamba, 506 F.3d 251, 258 (3d Cir. 2007).

24. In the context of a traffic stop, officers are permitted to conduct a protective search of the vehicle's passenger compartment if there are "specific and articulable facts" to indicate that the driver is dangerous and may gain immediate control of a weapon. Michigan v. Long, 463 U.S. 1032, 1049 (1983).

25. The detectives in this case did not have sufficient basis to conduct a protective search of the Impala pursuant to Long. Defendant closed the driver's door and was walking away from the vehicle when the officers approached. None of the detectives indicated that defendant

attempted to gain access to the car once Detective Gault arrested him. Defendant was being placed under arrest and handcuffed at the time Detective Emery retrieved the gun from the Impala. Given these circumstances, defendant was unable to gain "immediate control" of the firearm, which was under the seat behind the closed door of the Impala. Id. Nevertheless, suppression is not necessary if the seizure is justified for some other reason.

### E. Plain View Doctrine

26. The government argues that the firearm was properly seized pursuant to the plain view exception to the warrant requirement. (ECF No. 70 at 9.) Defendant maintains that Detective Emery's observation of the firearm through the Impala's windshield (which defendant agrees was legal) was "analytically distinct" from the actual entry into the vehicle to seize the firearm (which defendant argues was an illegal seizure). (ECF No. 67 at 6-7.) Defendant also argues that the illegal nature of the firearm was not "immediately apparent." (Id. at 7-8.)

27. The plain view doctrine allows for the warrantless seizure of evidence when three requirements are met: (1) the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the incriminating character of the evidence must be immediately apparent; and (3) the officer must have a lawful right of access to the object itself. United States v. Stabile, 633 F.3d 219, 241 (3d Cir. 2011) (citing United States v. Menon, 24 F.3d 550, 559-60 (3d Cir. 1994)).

28. Courts are careful to distinguish between mere observation of an object in plain view and a "plain view seizure." Id. at 241 n.17. Mere observation of an item left in plain view generally does not implicate the Fourth Amendment. Id. (citing Texas v. Brown, 460 U.S. 730, 738 n.4 (1983)). When police observe an item left in plain view, "'information obtained . . . may be the basis for probable cause or reasonable suspicion of illegal activity. In turn, these levels of

suspicion may, in some cases . . . justify police conduct affording them access to a particular item.'" Id. (quoting Brown, 460 U.S. at 738 n.4).

29. Looking into the interior of a car, even by changing one's position or bending over, is not a search within the meaning of the Fourth Amendment. Brown, 460 U.S. at 740. The use of a flashlight to illuminate the interior of a car is also not a search under the Fourth Amendment. Id. at 739-40 (noting that "[i]t is likewise beyond dispute that [the officer's] action in shining his flashlight to illuminate the interior of [the defendant's] car trenched upon no right secured to the latter by the Fourth Amendment").

30. Defendant accepts that Detective Emery lawfully observed the firearm through the Impala's windshield by using a flashlight. (ECF No. 67 at 7.) This observation did not constitute a search or a seizure within the scope of the Fourth Amendment, because it was merely an observation. Brown, 460 U.S. at 739-40. The observation did, however, give the detectives the necessary additional information which led to defendant's arrest after he acknowledged he did not have a license to carry a firearm. Stabile, 633 F.3d at 241 n.17. The first prong of the plain view test is satisfied because Detective Emery lawfully observed the firearm while standing on a public sidewalk. Id. at 241.

31. Defendant contends that the illegal nature of the firearm was not immediately apparent, and its illegality was only revealed following a "further search." (ECF No. 67 at 7-8) (citing Minnesota v. Dickerson, 508 U.S. 366, 379 (1993)). In Dickerson, a police officer conducted a Terry stop-and-frisk and felt a lump in the defendant's jacket pocket that was only identified as crack cocaine after the officer squeezed, slid, and otherwise manipulated the object in the pocket, which clearly did not contain a weapon. Dickerson, 508 U.S. at 378. The Court rejected this further search as being beyond the scope of a weapons pat-down pursuant to Terry.

Id. at 378-79. There was no such additional search in the present case, because Detective Emery merely inquired whether defendant—who was observed attempting to hide something in the same spot that the firearm was seen—had a license to carry a firearm. The question came during a valid Terry stop, and defendant confirmed that he did not have a license. Defendant's confirmation was sufficient to support his arrest. United States v. Pierce 531 F.3d 374, 378-79 (6th Cir. 2008) (finding that arrest for unlawful possession of a firearm was valid even though defendant did not admit to ownership of the firearm).

32. In circumstances very similar to the present case, the court in Pierce found that although the defendant did not move to suppress the gun found under his seat, "[a]fter [the officer] observed a gun magazine in plain view on the passenger-side floor-board of the car which [the defendant] had just exited, the police clearly had probable cause to arrest [the defendant]." Id. at 381-82.

33. Once defendant confirmed that he did not have a permit to carry the firearm, the officers arrested him. See Stabile, 633 F.3d at 241 n.17 (recognizing that a plain view observation may provide grounds for escalating a stop to either a Terry stop or arrest). For the third element of the plain view doctrine to be satisfied, it must be shown that Detective Emery's entry into the Impala was a valid search incident to arrest, which will be discussed below.

### F. Search Incident to Arrest

34. Defendant argues that Detective Emery's entry into the Impala exceeded the lawful scope of any permissible search incident to arrest because defendant did not have access to the inside of the vehicle. (ECF No. 67 at 24-25.) In support of this argument, defendant mischaracterizes the holding of Arizona v. Gant, 556 U.S. 332 (2009), by failing to address an exception that is relevant to this case.

35. When arresting the recent occupant of a vehicle, officers may conduct a warrantless search of the vehicle incident to arrest in two instances: "(1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains "'evidence relevant to the crime of arrest.'" Davis v. United States, 131 S. Ct. 2419, 2425 (2011) (quoting Gant, 556 U.S. at 344). The Supreme Court in Gant acknowledged its holding in Long that officers may "search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.'" Gant, 556 U.S. at 346-47 (quoting Long, 463 U.S. at 1049). The Court in Gant based its holding with respect to the second automobile exception to the warrant requirement on its decision in United States v. Ross, 456 U.S. 798, 820-21 (1982). In Ross, the Court held that if officers have probable cause to believe that a vehicle contains evidence of criminal activity, they may search any area of the vehicle where such evidence may be found. Gant, 556 U.S. at 346-47 (citing Ross, 456 U.S. at 820-21).

36. In the present case, Detective Emery observed the firearm in plain view under the driver's seat of the Impala, shortly after all the detectives observed defendant appear to hide an object in that location. Upon confirming that defendant did not have a license to carry a firearm, defendant was placed under arrest. Detective Emery's entry into the car after the arrest was justified as a lawful search incident to arrest because the firearm was evidence of the crime for which defendant was arrested. Gant, 556 U.S. at 344. Detective Emery testified about the need to secure the weapon he observed because the other three former occupants of the Impala were still on the scene, and were able to access the car and its contents. The detectives were also "pretty much outnumbered." Id. at 346-47. Because defendant was taken into custody, evidence of defendant's crime was observed in the car, and an ongoing threat existed that a nonsuspect could

19

access the firearm, the dictates of Gant permitted Detective Emery to conduct a valid search incident to defendant's arrest.

### G. Exigent Circumstances

37. Defendant also argues that Detective Emery's entry into the Impala was unlawful because the detectives manufactured an exigency by directing defendant to return to the vehicle. (ECF No. 67 at 25-27.) The government does not argue that the entry was the result of an exigent circumstance, and as has already been found, Detective Emery's entry was a valid search incident to a lawful arrest. Therefore, the court will not address the exigent circumstances argument.

### H. Conclusion

38. For the foregoing reasons, the stop of defendant was valid, and the recovery of the firearm was lawful pursuant to a search incident to arrest. Therefore, the motion to suppress must be denied.

### III. Order

AND NOW, this 26th day of November, 2012, upon consideration of the parties' filings, the arguments made by counsel at the suppression hearings held on May 24, 2012 and July 30, 2012, and the testimony of witnesses and the evidence introduced at those hearings, IT IS HEREBY ORDERED that, in accordance with the findings of fact and conclusions of law filed herewith, defendant's motion to suppress (ECF No. 28) is DENIED.

                                              By the court,

                                              /s/Joy Flowers Conti
                                              Joy Flowers Conti
                                              United States District Judge